Filed 9/21/22  In re G.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re G.S. et al., Persons Coming Under the Juvenile Court Law. | |
| | D080309 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. NJ15804A-C) |
| Plaintiff and Respondent, | |
| v. | |
| Briana M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia Silva, Acting County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel for Plaintiff and Respondent.

Briana M. (Mother) appeals from juvenile court orders removing her three minor children from her custody, due to serious domestic violence between Mother and the children's father, Aaron S. (Father).[1] Mother contends there is no substantial evidence to support removal. The San Diego County Health and Human Services Agency (Agency) maintains removal was appropriate and supported by the record. We agree, and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Underlying Events*

Mother and Father began dating around eight years ago. They have three children: G.S., who is now four years old; Gi.S., who is three, and C.S., who is nearly two. According to paternal grandmother, Keri S., the parents had "engaged in 'drag out' physical fights with fighting, punching and kicking each other since they started their relationship." The family was referred to child welfare services (CWS) for domestic violence in 2019 and 2021. The family also relied on Olive Crest Safe Families program (Safe Families) twice during that period. Safe Families "provides child care 'hosting' for at-risk children and parents in need while they work on family stabilization, child abuse prevention and early intervention of abuse or neglect."

In January 2022, the parents had another domestic violence incident, while the family was at home in their recreational vehicle (RV). Father thought Mother took his car keys and became upset, he took her phone, and the situation escalated. They went outside and a fight ensued, leaving her with scratches and bruises on her arms, a gash on her right shoulder, and a hoarse voice. Father had a split, bruised lip. Father called the police, and said Mother punched him when he demanded his keys back. Mother told the

_____

[1] Father is not a party to the appeal. We discuss him as necessary.

police she denied taking his keys and they started arguing, he tackled and choked her, and she was afraid she would lose consciousness. The police determined Father was the dominant aggressor, arrested him, and placed him in a wrap restraint when he became uncooperative.

The Agency received a referral based on the incident. Social worker Edna Davis met with Mother and tried to develop a safety plan. Mother said they were hitting each other, and when asked about arm bruising that looked like fingerprints, she said this was from Father grabbing her, he "looked worse," and she split his lip with a broom. She said the parents were going to send the children to stay with Keri S. in Tennessee for a couple of months. Davis prepared two safety plan options. First, Safe Families host parents would keep the children until the family left for Tennessee. Second, if the children returned to the parents' care, and Safe Families could not assist, Father would temporarily stay at a hotel or friend's home. Mother agreed to both plans. Davis tried to speak with Father, but he was leaving for work. When she called him later with the proposed safety plan, he did not agree to it.

Social workers also spoke with witnesses, including the oldest child, G.S.; Safe Families host parents Joel B. and Christian B.; and Keri S. When G.S. was asked if she saw the parents fighting, she said, "No. Me[,] brother and sister were inside." The social workers asked if this happens a lot, and G.S. said, "Yeah it happens all the time, we watch it all the time." Joel said Father called him before the police arrived, he went over and found the children screaming and crying in the RV, and he heard Father threaten to hurt a police officer once released. Christian reported Mother said she cut herself and planned to blame Father, but did not tell the police because they would have removed the children. In addition to noting the parents' history

3

of fighting, Keri S. said the parents fought in front of G.S. and Mother was not welcome in her home. We discuss the input from Keri S. and Safe Families further, *post*.

### B. *Dependency Petitions and Detention*

The Agency filed petitions under Welfare and Institutions Code, section 300, subdivision (b)(1).[2] Pertinent here, the petitions alleged the children were "at risk of exposure to a violent confrontation," citing their presence during the January 2022 incident; Father strangling Mother, and Mother hitting him with a broom; and both sustaining visible injuries. The petitions further alleged the parents have a history of domestic violence and the children "witnessed the parents fight on numerous occasions," which placed them at substantial risk of serious physical harm.

The Agency's detention report addressed the January 2022 domestic violence incident, described above, as well as the prior CWS referrals and input from Keri S. and Safe Families.

The 2019 referral involved a fight in which Father grabbed Mother's arm, causing abrasions, and she cut her leg with a knife and threatened to blame him. He was arrested for domestic violence. The 2021 referral alleged Mother was seen with a black eye. Both referrals were evaluated out, because the children were not present.

Paternal grandmother Keri S., Father's biological aunt, adopted him when he was a teenager. She cared for G.S. and Gi.S. for around nine months when they were younger, and had been concerned for the children's safety since they were born. She saw a number of fights, including one time when Mother was pregnant with Gi.S.; Mother had started throwing

---

[2] Further statutory references are to the Welfare and Institutions Code, unless noted.

4

decorative glass balls at Father, and woke G.S. to "have her witness the fight and [tell] the child she needed to be away" from him. She indicated Father called her about the January 2022 incident, this was the "fourth time" he called about "violent fighting in the last year," and he said the previous week that G.S. told him and Mother to stop fighting. Keri S. stated Mother was "not welcome at [her] home." When asked about Mother's strengths, she said, "I'm sorry, but I don't have any positive things to say" about her. She denied the parents made plans to come live with her or send the children there, or that other relatives in Tennessee would allow the parents to stay there. She said there was a paternal uncle in Long Beach, who "refuses to interact" with Mother, but she could move in with him in order to be a placement option.

Safe Families host parents Joel B. and Christian B. cared for G.S. in 2019, and during the second half of 2021. Christian said she saw Mother with bruising on her eyes and arms, G.S. told her Father caused the injuries, and G.S. told Joel that Father "often punches" Mother in G.S.'s presence. Christian said they took G.S. to McDonald's earlier that day, she wanted something she did not get, and she yelled, " 'If you don't give it to me, I'm going to cut my hands! With scissors!' " Host parent Emily R. said C.S. had "pretty much" been in her care 80 percent of the time since late June 2021. She hoped to be "a support person . . . to call in crisis," but the parents had "used [the program] as more than that." A social worker asked Rose P., intake coordinator for Safe Families, about a temporary extension in hosting care, to allow for safety planning. She thought the families would likely agree, as they had made statements about "being 'more involved' in the children's safety longer term."

The Agency recommended the children be detained in out-of-home care, explaining the parents' history of domestic violence was "escalat[ing] in

5

severity," and without services, the children would be at risk of severe injury. At the detention hearing, Mother's counsel said she was no longer in a relationship with Father and would abide by orders to keep him away. The juvenile court detained the children, granted Mother supervised visitation, and ordered she "must visit separately" from Father.

Later that month, the criminal court issued a criminal protective order (CPO), which protects Mother from Father and expires in 2025.

### C. *Jurisdiction and Disposition*

Social worker Jessica Arellano filed the jurisdiction and disposition report in February 2022, which recommended removal. The report indicated Keri S. attended a child and family team (CFT) meeting, and the Agency was starting the Interstate Compact on the Placement of Children (ICPC) assessment process. The report also addressed the children's placements, and input from the parents.

G.S. was placed with Kristen, also a prior Safe Families host parent. C.S. was placed with Emily R., a prior host parent from Safe Families. Gi.S. initially was placed with Danielle and Justin, and later moved to C.S.'s placement. The Agency was seeking a placement for all three children. Kristen reported G.S. made comments about "incidents that might have occurred" and said Mother did not have a cell phone because Father broke it. Danielle reported Gi.S. tried to make himself vomit at bed time, woke up with nightmares, and had what she "wonder[ed] . . . [were] panic attacks."

Mother said her parents divorced when she was four years old and she lived with the maternal grandmother, who "has always been on drugs," until she entered foster care at age six. She described an argument in February 2021, during which the maternal grandmother hit her and the police came, but the children were not present. After foster care, the maternal

6

grandfather took custody of Mother, and beat her as a child. The "last time she saw [him], he punched her in the face and threw a cigarette at her." Mother asked social worker Arellano about maternal aunt Alana relocating to California, but later said the maternal aunt "said no" to placement "because there [are] a lot of people living there."

Mother said there were "a lot of false allegations" in the detention report, including G.S. pretending to cut herself. She denied prior violence or having a black eye, and said she "has low iron" so bruises easily. She maintained the January 2022 altercation was an "isolated incident," and the children were asleep at the time. When asked why G.S. said she saw Father punch Mother, Mother denied this happened and said she did not think G.S. said that. Mother was starting parenting classes and therapy, and signed up for anger management and domestic violence classes. Regarding Father, she said they "love each other very much"; they "are working on communication"; and "couples counseling and individual counseling would help a lot because they have a good relationship."

Social worker Arellano also spoke with Father. He was in foster care as a child, too, and went to live with Keri S. as a teenager. He said she "got him arrested twice for DV" and he was placed on juvenile probation, but denied there was any violence. He denied punching or choking Mother, and said he wanted to sign the safety plan and did not know why social worker Davis did not try to come back and talk to him. As for Safe Families, he said "they wanted to help to avoid [CWS] but then . . . would try to send the kids early back to them." He said he had stayed away from Mother since the CPO and was living in his car, but she had asked the judge not to issue the CPO, and he was going to ask the judge to lift it. He felt they "need[ed] a little bit

of anger management and couple's counseling." He wanted the children placed locally, but did not identify a relative.

The Agency recommended the children be removed from parental custody. It remained concerned about the children's emotional and physical well-being, as Mother continued to minimize the prior domestic violence incidents and the severity of the recent incident and she lacked insight into the impact of domestic violence on young children. She also had to demonstrate she could provide a home free of violence, and learn skills to be a safe parent and deal with stress without violence.

Agency addendum reports in February and April 2022 provided additional information on the children and parents.

Social worker Arellano received a DSEP (developmental and social-emotional behavioral screening) individual care plan for G.S. in February that identified "[h]istory of trauma" as a concern. In March, a DSEP worker told Arellano that G.S. "has been talking more about domestic violence" between the parents. The DSEP worker also reported concerns about Gi.S., including sleep issues, anxiousness, and history of trauma. Emily R., his foster parent, noted he had anxiety and "doesn't want any adults to be mad at him."

Arellano met with Mother in late March at a CWS meeting room. Mother was attending parenting and domestic violence classes, and learning things like how to deescalate a situation and how to notice red flags. She was also seeing a therapist. When Arellano asked about relative placement and mentioned the maternal grandfather, Mother "became emotional and tear eyed" and said she "would need to get back to [Arellano] on that." Mother also asked her to "please not reach out" to the maternal grandmother. Mother denied she and Father were not following the CPO. As they left the

8

meeting, Father came into the CWS lobby and said he thought there was a visit. After Arellano stated the visit was moved to G.S.'s birthday, he said he "did not know why they can't do visits together" and that the criminal court said they "can have peaceful contact." Arellano told him they were ordered to have separate visits and the CPO barred any contact. Father said "okay" and left.

Arellano spoke with Father in late March and early April. He said he and Mother were following the CPO, but she was "not scared of him and they are completely in love with each other." He said he tried to sign up for domestic violence classes, but his screen was damaged; he was willing to use a CWS laptop.

Mother's therapist and the district attorney on Father's criminal case also provided input. The therapist had "concerns [she] might be minimizing the situation," as Mother said "it only happened once" and the therapist was unsure if that was true. The district attorney said Mother was in criminal court at the last hearing, "claim[s] it was blown out of proportion," and "wants the CPO dismissed." She said Mother had a "decent amount of aged bruising" and when she told Mother they had photographs, she "insisted the kids were asleep and that the dogs did it." The district attorney also said the criminal court had denied Mother's request to change the CPO to a "no negative contact" order.

In April 2022, the foster parents reported Father brought the children stuffed animal toys, which had Mother's pre-recorded voice.

The Agency continued to recommend removal. Mother had "just begun" her classes, and the Agency had concerns she still minimized the domestic violence, citing the therapist and district attorney input, and that the parents were not following the CPO.

## D. *Contested Jurisdiction and Disposition Hearing*

The contested jurisdiction and disposition hearing was in April 2022. The juvenile court received the Agency reports into evidence, and the Agency offered social worker Arellano for examination, but no one cross-examined her. During closing arguments, both parents argued for placement with Mother, and Father's counsel noted he was completing domestic violence classes in his criminal case. Minors' counsel agreed with the Agency that removal was appropriate.

The juvenile court found by clear and convincing evidence that the minors were children described in section 300, subdivision (b). The court stated "there was a very serious domestic violence incident with injury," and it found Mother's "statements to be the more credible ones, certainly the ones she made rather contemporaneously . . . ." The court also noted the children were "showing signs of trauma," and "the risk issue is not just current, but also continuing."

The juvenile court then found by clear and convincing evidence that removal was necessary. The court recognized Mother was engaged in services and trying to address the issues, and should be commended for that progress. The court stated, "What's clear, however is that . . . this was a very serious domestic violence incident," the children were starting to "feel comfortable enough to open up about their own experiences with the domestic violence," and at least one was "recounting times when there was physical altercation between the parents." The court further stated the parents needed more time "to delve deeper into the dynamics of the relationship that give rise to the physical altercations" and to "com[e] up with alternative ways of settling disagreements without . . . yelling or physical contact." The written orders stated reasonable efforts were made to prevent removal, and

10

there were no reasonable means to protect the children's physical health without removal.

The juvenile court gave the Agency discretion to lift supervision for visits and start a 60-day trial visit with either parent, subject to minors' counsel's concurrence.  Mother appealed.

## DISCUSSION

### A.  *Applicable Law*

To enter an order removing a child from parental custody, the juvenile court must find clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)  The court must also determine if "reasonable efforts were made to prevent . . . the need for removal" and "state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e).)

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136 (*T.V.*).)  The court may consider the "parent's past conduct and current circumstances."  (*In re D.B.* (2018) 26 Cal.App.5th 320, 332 (*D.B.*).)

We review the court's removal order for substantial evidence, bearing in mind the heightened clear and convincing evidence standard of proof. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996 (*O.B.*).)  The question before us is "whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was

11

true." (*O.B.*, at p. 1011.) We "must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011-1012.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

## B. *Analysis*

### 1. *Substantial Danger*

Having reviewed the entire record, and taking into account the clear and convincing standard of review, we conclude there is substantial evidence the children would be in substantial danger in Mother's custody. (§ 361, subd. (c)(1).) They were detained after a violent altercation that resulted in injuries to both parents and Father's arrest for domestic violence, while the children were at home. At the time, Mother said Father choked her to the point where she feared losing consciousness, and the juvenile court found this account credible. This incident was part of pattern of domestic violence that spanned the parents' entire relationship. (See *D.B.*, *supra*, 26 Cal.App.5th at p. 332 [court may consider parents' past conduct].) Both paternal grandmother Keri S. and the oldest child, G.S., reported witnessing fighting. And, although Father was the dominant aggressor in the recent incident, Mother also engaged in physical aggression and used it as a tool in arguments, including hitting him with a broom during that incident, throwing glass balls at him, and cutting herself with the intention of blaming him. There was also physical evidence of on-going domestic violence, including Mother's aged bruises.

Further, there was evidence the older two children, G.S. and Gi.S., were already suffering harm from the domestic violence. (See *In re E.B.* (2010) 184 Cal.App.4th 568, 576 ["Children can be 'put in a position of physical danger from [spousal] violence' "], disapproved on other points in *O.B.*, *supra*, 9 Cal.5th at p. 1003, fns. 4 and 7; *In re E.B.*, at p. 576 [" 'even if they are not physically harmed, children suffer enormously from simply witnessing the violence' "].) There were concerns about both children's history of trauma, G.S. was talking more about domestic violence, and Gi.S. experienced difficulties around sleep, events that seemed like panic attacks, and anxiety. Christian B. also reported G.S. threatened to cut herself when she did not get her way, potentially mimicking Mother's behavior. (See *T.V.*, *supra*, 217 Cal.App.4th at pp. 130, 136 [affirming removal order based on domestic violence; "most recent argument culminated in serious harm" to mother; father denied responsibility; and five-year-old minor had not been physically injured, but "felt scared when her parents fought"].)

Although Mother had started services and there had not been a new incident of domestic violence, the record reflects she needed more time to address the domestic violence issues. She still minimized the domestic violence and lacked insight into its impact on the children, and evidence cast doubt on her claim that she was willing to cease contact with Father. (See *In re V.L.* (2020) 54 Cal.App.5th 147, 156 ["A parent's denial of domestic violence increases the risk of it recurring."]; *cf. In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."].) Despite telling the police that Father choked her during the January 2022 incident, Mother then told the social worker that she and Father were hitting each other, she hit him with a broom, and he "looked worse." She also minimized or denied prior incidents, and implausibly

13

blamed low iron and dogs for her bruises. Her insistence that the children were asleep during the January 2022 incident illustrates her lack of insight. Not only can children wake up during a fight (as they apparently did here, as host parent Joel found them screaming and crying), leaving sleeping children for an altercation outdoors is not protective behavior.

As for Father, Mother did claim she was willing to stay apart from him and they were complying with the CPO, and Father was living in his car. But other statements by Mother showed a desire to stay with him, including that they "love each other very much" and have a "good relationship," and that she wanted to pursue couple's counseling. He appeared to share these sentiments. The parents also tried to avoid or limit the CPO, and there were concerns they were not complying with it, as evidenced by Father's arrival at CWS when Mother was there, telling social worker Arellano the CPO allowed peaceful contact, and providing toys with Mother's pre-recorded voice. The juvenile court could impliedly conclude Mother was not credible here and she was not yet willing to be apart from Father or comply with court orders limiting contact, a determination we cannot revisit. (*O.B.*, *supra*, 9 Cal.5th at pp. 1011-1012.)

Substantial evidence thus reflected the children were at substantial risk of harm absent removal, notwithstanding Mother's participation in services, Father leaving the family home, and the CPO. We accordingly disagree with Mother that these events meant she had ceased worrisome behavior and posed no risk to the children by disposition.[3]

---

[3] We recognize the juvenile court gave the Agency discretion to transition to unsupervised and extended visits. That does not mean the court felt Mother was ready to keep the children safe on a full-time basis.

14

Mother's other arguments do not compel a different result.

First, she contends the children were bonded to her and their visits were positive; she personally knew the trauma of foster care; and "it did not benefit them to be placed separately . . . ." Section 361, subdivision (c), turns on the risk of danger from continued parental custody, not the parental bond, impact of foster care, or sibling relationships. We note Gi.S. and C.S. were already placed together, the Agency was looking for a placement to take all three children, and Keri S. was being evaluated as a relative placement.

Second, Mother contends she was "remorseful" and "took full responsibility." She also contends that "in four years, there were only these three alleged incidents" (i.e., the January 2022 incident, and 2019 and 2021 referrals), and there was no continuing domestic violence. For us to accept these arguments would require us to draw inferences against the juvenile court's ruling, which we cannot do. (*O.B.*, *supra*, 9 Cal.5th at pp. 1011-1012.) As described above, the record contains evidence that Mother minimized or denied what happened (permitting the court to impliedly reject claims of remorse or responsibility), and that domestic violence had long permeated the parents' relationship—well beyond the three referrals.

Third, Mother contends a "number of courts have opined[] there must be at least some threat of actual physical harm, not simply a threat to a child's emotional well-being, in order to justify removal," citing *In re Isayah C.* (2004) 118 Cal.App.4th 684, 698. But the same court that decided *Isayah C.* later held in *In re H.E.* (2008) 169 Cal.App.4th 710 (*H.E.*) that emotional harm is enough, and "limit[ed] the holding [in *Isayah C.*] to an unremarkable deduction that, where the subdivision requires risk of emotional or physical harm and there is no risk of emotional harm, there must be risk of physical harm." (*Id.* at pp. 721-722; see *In re J.S.* (2014) 228

15

Cal.App.4th 1483, 1493-1494 [domestic violence in children's presence was "substantial evidence of a substantial danger to the children's emotional well-being, if not their physical well-being"], disapproved on another point in *O.B.*, *supra*, 9 Cal.5th at p. 1003, fn. 4.)[4] Further, the domestic violence could continue to escalate in severity, placing the children at risk of both further emotional harm and physical injury.

Finally, Mother's reliance on *In re I.R.* (2021) 61 Cal.App.5th 510 and *In re M.V.* (2022) 78 Cal.App.5th 944 (*M.V.*) is misplaced, as both cases are distinguishable. In *I.R.*, the Court of Appeal reversed an order removing a child from her father, who by then lived in a different state from the mother and had no other child welfare history, based on two incidents of slapping. (*I.R.*, at pp. 512-514.) The court found no substantial evidence that domestic violence would continue, noting there was no evidence the parents were in contact, the father expressed no desire to reconcile, and the mother expressed no unwillingness to stay away. (*Id.* at p. 521.) Here, in contrast, there was evidence of a long history of domestic violence, including two prior referrals; that both parents still lived in the same area; and that both wanted to pursue their relationship.

In *M.V.*, the minors were removed due to domestic violence between the parents in which the mother was the dominant aggressor. (*M.V.*, *supra*, 78 Cal.App.5th at pp. 947-948.) Father made progress in services, but recanted

_____

4    Mother also cites *In re Jasmine G.* (2000) 82 Cal.App.4th 282, which does involve physical harm, and is distinguishable regardless. (*Id.* at pp. 284-286, 288-289 [reversing order removing teenager due to corporal punishment where, among other things, parents expressed remorse, one therapist opined it was "totally safe" for her to return, and teenager "wanted to go home"; noting social worker's belief that parents lacked a " 'full understanding' " of her "adolescent 'issues' " was not substantial evidence].)

that certain events took place. (*Id.* at pp. 951-953.) At disposition, the social worker could not "think of any safety risk" in placing the children with the father, but believed the parents remained in denial and had not taken responsibility. (*Id.* at pp. 955-956.) The parents and the minors' counsel opposed removal from him, and appealed the removal order. (*Id.* at pp. 947, 957.) This court reversed, explaining the father's denials were troubling, but not sufficient to justify removal, and the social worker's belief was not clear and convincing evidence, noting she testified it "*was* safe" to return the children. (*Id.* at pp. 962-963.) Here, in contrast, the Agency felt the children were at risk in Mother's care, and she elicited no contrary testimony from the social worker at the hearing. Further, ample evidence of substantial danger did not turn on Mother's minimization of domestic violence or the social worker's views, including input from witnesses and the oldest child, G.S.; concerns about trauma experienced by G.S. and Gi.S.; and the parents' actions, including trying to avoid and modify the CPO. Minors' counsel also supported, rather than opposed, removal.

### 2. *Reasonable Efforts and No Reasonable Alternatives*

The record also contains substantial evidence that reasonable efforts were made to avoid removal, and there were no reasonable means to avoid it. (§ 361, subd. (c)(1).) Mother contends the Agency had reasonable alternatives for leaving the children with her that it failed to use, including relative support in Tennessee or California, continued use of Safe Families, an order requiring Father to leave the home, and/or oversight through Agency visits

17

and other means. The record reflects these options were unavailable, had been exhausted, or otherwise were not adequate to protect the children.[5]

First, Mother contends the Agency could have permitted Mother to go to Tennessee and have Keri S. assist with the children, have Keri S. come to California to assist, or have "another relative" help her. The Agency did include a potential family move to Tennessee in the pre-petition safety plan, but Father did not agree to the plan. More importantly, Keri S. said there were no plans for the family to come to Tennessee, she would not permit Mother in her home, and no other Tennessee relatives would, either. Although Keri S. was willing to live with a paternal uncle in California to be a placement option for the children, she never said she would help Mother in caring for them (and her comment that she had "nothing positive" to say about Mother suggests she would not do so).

Mother also does not establish any other relatives were available and suitable to assist her. The maternal aunt apparently declined to assist, because too many people lived with her. The maternal grandfather beat Mother as a child, punched her recently, and she teared up when social worker Arellano mentioned him; Mother said she would have to get back to Arellano about him, and there is no indication she did. As for the maternal

---

5    Mother also contends that, although the juvenile court "concluded reasonable efforts were made" to avoid removal, it "failed to consider" such options. To the extent she means the court did not state its facts for this finding, or the related reasonable alternatives finding, any such error was harmless. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218-1219 [no reasonable probability of findings in favor of parental custody]; *In re Heather A.* (1996) 52 Cal.App.4th 183, 196 [discussing efforts and alternatives interchangeably], disapproved on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 628.) As we discuss herein, Mother does not establish there were any viable alternatives that the Agency failed to try.

grandmother, Mother said she had a history of drug problems and that she hit Mother in February 2021, and Mother asked the social worker not to contact her. The paternal uncle mentioned by Keri S. refused to interact with Mother, and Father did not identify any local relatives.[6]

Second, Mother contends she could have continued to use Safe Families. The record suggests Safe Families is meant to be an alternative to dependency proceedings, and although the program coordinator indicated prior to detention that the host families could potentially assist with safety planning, it is not clear this assistance remained available once the petitions were filed. Regardless, the parents already tried relying on Safe Families host parents for relief, and this did not prevent the January 2022 incident. Indeed, the parents only contacted Safe Families host father Joel B. *after* that incident—not before the situation escalated to violence.

Third, Mother argues the juvenile court could have ordered Father to leave the home, citing section 361, subdivision (c)(1)(A), and says this was "easily enforceable" due to the CPO and the parents' willingness to follow it. Section 361, subdivision (c)(1)(A) states the court "shall consider, as a reasonable means to protect the minor . . . . [¶] [t]he option of removing an offending parent . . . from the home." But as Mother acknowledges, Father effectively was *already* ordered out of her home, due to the CPO. And, as

---

[6] On reply, Mother contends without citation that she "believes [it] is not currently true" that she "was not welcome in [Keri S.'s] home and no relative was willing to help." This belated point, unsupported by a record citation, is forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407.) She also contends the Agency "did not explore Father going to [Keri S.'s] home with the children." Removal from Mother is the issue before us, not Father, and regardless, there is evidence that this was not a reasonable option, either (including Father's prior domestic violence with Keri S.).

19

explained *ante*, the court could conclude that Mother's purported willingness to comply with the CPO and other no-contact orders was not credible. Further, Father's history of domestic violence began years ago, with Keri S., continued with Mother, and he had just started domestic violence classes. The court could impliedly find that an order removing him from the home was not adequate to protect the children. (Cf. *In re Michael S.* (2016) 3 Cal.App.5th 977, 984 [although § 361, subd. (c)(1)(A) requires consideration of removing an offending parent, it "does not state that the option of removing a parent from the home will *necessarily* be sufficient to protect the child"]; compare *M.V.*, *supra*, 78 Cal.App.5th at pp. 954, 964-965 [social worker acknowledged at disposition hearing that reasonable alternatives had not been fully explored, including removal of offending mother].)

Fourth, Mother contends the juvenile court "could . . . have ordered unannounced home visits"; she "could have been given a safety plan of some sort"; and reasonable efforts to avoid removal could have included those suitable at the detention stage. (See § 319, subd. (f)(1) ["case management, counseling, emergency shelter care, . . . parenting training, transportation"].) Mother is essentially arguing the Agency should have done more to prevent removal. But "reasonable efforts . . . need only be reasonable under the circumstances, not perfect." (*H.E.*, *supra*, 169 Cal.App.4th at p. 725.) Mother's specific assertions here also lack merit. Unsupervised home visits would not necessarily prevent on-going domestic violence from recurring, just as Safe Families respite care did not. The Agency tried to safety plan before detention, and Father would not agree; further, Keri S. was part of that plan and it turned out she would not have Mother in her home. And Mother had engaged in some services identified in section 319, including counseling and parenting classes, but the juvenile court found, and the record reflects, that

20

she had just started the classes and needed more time to address the domestic violence issues.

Finally, Mother relies on cases that do not involve a similar lack of viable alternatives to removal or are otherwise distinguishable.  (See, e.g., *In re Henry V.* (2004) 119 Cal.App.4th 522, 529-531 [reversing removal order where child was removed for single incident of physical abuse; social worker testified about in-home services that could mitigate risk of further physical abuse, including unannounced visits, nursing services, and in-home counseling]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171-173 [reversing removal; reports provided "skimpy" information regarding history of domestic violence, removal decision was based in part on court's conclusion that parents did not participate in programs, and level of cooperation was unclear from the record], superseded by statute on another point; *In re Steve W.* (1990) 217 Cal.App.3d 10, 15-16, 22-23 [reversing removal as to non-offending mother, where juvenile court's concern appeared to be that she would enter another abusive relationship; no evidence showed "less drastic alternatives could not be successfully implemented"].)

We conclude the juvenile court did not err in removing the children from Mother's custody.

## DISPOSITION

The orders are affirmed.


                                        O'ROURKE, J.

WE CONCUR:



McCONNELL, P. J.



HUFFMAN, J.